[Cite as *State v. Ridley*, 2020-Ohio-402.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-18-1184

     Appellee                              Trial Court No. CR0201701711

v.

Edmund L. Ridley                           **DECISION AND JUDGMENT**

     Appellant                            Decided:  February 7, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Dennis C. Belli, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Edmund Ridley, appeals the judgment of the Lucas County Court of Common Pleas, following a jury trial, convicting him of one count of aggravated possession of drugs, one count of aggravated trafficking in drugs, and one count of corrupting another with drugs, and sentencing him to a combined prison term of nine

years and five months.  For the reasons that follow, we reverse, and vacate appellant's convictions.

## I.  Facts and Procedural Background

{¶ 2} On April 13, 2017, Edward Lowe overdosed on drugs, resulting in severe brain injury and physical impairment.  Toledo police responded to the scene of the overdose and questioned Lowe's companion, Max Olson.  Olson agreed to assist the police by calling his drug dealer to set up another purchase of drugs.  Toledo police accompanied Olson to the apartment complex where the drug transaction was to occur, and encountered appellant.  Upon seeing the police, appellant fled, and in the process dropped a small baggy containing a white substance.  The substance later tested positive for acrylfentanyl.  The police chased and quickly apprehended appellant.  In response to police questioning, appellant indicated that he came from a nearby apartment.  The door to that apartment was open, and police could see drugs inside the apartment on a coffee table.  Police immediately entered the apartment with guns drawn, and found the apartment lessee, Brittany Snow, inside.  Snow ultimately consented to a search of the apartment, and the drugs recovered from that search included cocaine and acrylfentanyl.

{¶ 3} On April 21, 2017, the Lucas County Grand Jury returned a six-count indictment against appellant, charging him with one count of possession of cocaine in violation of R.C. 2925.11(A) and (C)(4)(b), a felony of the fourth degree; one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2) and (C)(4)(c), a felony of the fourth degree; one count of aggravated possession of drugs (fentanyl) in violation of R.C.

2.

2925.11(A) and (C)(1)(a), a felony of the fifth degree; one count of aggravated trafficking in drugs (fentanyl) in violation of R.C. 2925.03(A)(2) and (C)(1)(a), a felony of the fourth degree; one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3) and (C)(1)(a), a felony of the second degree; and one count of tampering with evidence in violation of R.C. 2921.12(A)(2) and (B), a felony of the third degree.

{¶ 4} On August 31, 2017, appellant moved to suppress the physical evidence seized from the warrantless search of Snow's apartment. The trial court denied appellant's motion, finding that he had not established a reasonable expectation of privacy in the apartment, and thus lacked standing to challenge the search.

{¶ 5} Thereafter, the matter proceeded to a four-day jury trial commencing on July 24, 2018. Prior to the start of the trial, the state dismissed the count of tampering with evidence.

{¶ 6} The first witness called by the state was Heather Flores. Flores testified that she had just gotten off of work when she saw a little girl, around ten years old, crying near a car in the parking lot. Flores approached and noticed the girl's dad, Edward Lowe, slumped over in the driver's seat. Two other children, ages five and two, were in the backseat of the car. Flores called the police, and took the children into her own car. Flores also noticed another man, Max Olson, near the car, who was on his knees "nodding out." Flores did not speak to Olson.

{¶ 7} The state next called the little girl, C.L. as a witness. C.L. testified that on April 13, 2017, she and her siblings rode with Lowe to Detroit where they picked up

3.

Lowe's friend, Olson. They then drove to Olson's grandmother's house in Detroit to get money. After that, they drove down to Toledo. C.L. testified that while they were driving to Toledo, Olson was on the telephone. Upon arriving in Toledo, they parked in a parking lot and waited for approximately an hour. Eventually, Olson got out of the car, and approached the driver's side of a "whiteish, tannish car" with tinted windows. Olson then returned to Lowe's car, and they drove across the street. C.L. observed Lowe and Olson leaning over, then she saw Lowe sit back up and heard him say something like "that hit me hard." C.L. testified that Lowe then started falling asleep, and they could not wake him up. C.L. described that her dad was purple, and had "yellow orangish stuff" coming out of his nose. She testified that Olson was out of the car and was jumping around. C.L. asked Olson if she should call 9-1-1, and he told her not to because he could get in trouble. C.L. then called her grandmother, who told her to call 9-1-1, which she did.

{¶ 8} C.L. testified that after her dad was released from the hospital, she visited him while he was in a nursing home. Lowe was in a wheelchair and able to move around, but he was not able to talk. Lowe now lives with his mother in West Virginia. C.L. stated that Lowe cannot see very far, but he can walk with assistance. C.L. also testified that Lowe can now speak much better.

{¶ 9} Following C.L., the state called Kimberly Mitchell, who is C.L.'s great aunt. Mitchell testified that following the overdose, Lowe was taken to the hospital and put in a medically induced coma. He stayed at the hospital for three weeks and was then

4.

transferred to a rehabilitation facility. Following that, Lowe went to live with his mother in West Virginia. Mitchell testified that Lowe is completely different than he was before the overdose; Lowe is now almost totally blind and can barely walk, he cannot hold a fork or spoon, and he is forgetful and irritable.

{¶ 10} The state next called Toledo Police Officer Jeffery Bodeman. Bodeman testified that he was one of the first people to respond to the scene of the overdose. After Bodeman's partner pulled Lowe out of the vehicle and began chest compressions, Bodeman spoke with Max Olson, who appeared to be on drugs. Bodeman was informed by Olson that he and Lowe had used heroin before Lowe became unconscious. Bodeman then conducted a pat-down of Olson, and recovered two syringes from his pants pocket. Bodeman also discovered a crack pipe in the driver's side door of Lowe's car.

{¶ 11} Toledo Police Sergeant William Bragg testified next for the state. Bragg testified that most of the drugs beings sold on the street at the time were sold as heroin or "china white," but in reality contained fentanyl or an analog of fentanyl such as acrylfentanyl. Bragg testified that he arrived at the scene of the overdose after Lowe had already been transported to the hospital. Bragg spoke with Olson, and Olson agreed to contact his drug dealer, who went by the name "Truck," to set up another purchase. Bragg testified that Olson used his own phone to call Truck, and as he was dialing, Bragg observed the phone number listed under "Truck" in the phone. Bragg could also see that it was the same contact that had been called earlier that day. The person on the other end of the line then directed Olson to meet him at an apartment complex.

5.

{¶ 12} Bragg testified that Olson went with Toledo Police Detective Andrew Pennington in Lowe's car to the location provided by the person on the other end of the phone. Bragg followed with several other members of the police department. When he arrived in the parking lot, Bragg observed a tan car with tinted windows. Bragg testified that Olson approached the apartment building where the transaction was to occur with Pennington following him, and with Bragg right behind them. As the door opened, Bragg and Pennington identified themselves as police, and the suspect fled up a flight of stairs. Pennington apprehended the suspect, later identified as appellant, at the top of the stairs. As appellant was fleeing, Bragg observed him toss what appeared to be a baggy onto the ground. The baggy contained an off-white, powdery substance.

{¶ 13} At the time of the arrest, appellant was not wearing any shoes, which led Bragg to determine that appellant had come out of a nearby apartment that had a door still slightly ajar. Bragg knocked on the door, and as he knocked it opened a little more, which allowed him to observe a coffee table that held more of the off-white, powdery substance in bags, which was later tested and identified as acrylfentanyl. Bragg then entered the apartment with a few other sergeants, and encountered Brittany Snow coming from the back of the apartment. Snow ultimately consented to a search of her apartment.

{¶ 14} Bragg testified that on a television stand near where the drugs were located was $469 in cash and appellant's photo identification. The police also found cocaine and crack cocaine in the apartment. In addition, Bragg testified that they found car keys on

6.

the couch in the apartment, and that the keys unlocked the "gold, tannish" car with tinted windows that Bragg observed in the parking lot of the apartment building.

{¶ 15} The final witness to testify was Toledo Police Detective Andrew Pennington. Pennington testified that he arrived at the scene of the overdose with Bragg. After speaking with C.L. and Olson, Pennington asked Olson if he would assist in the investigation, and Olson agreed. Pennington testified that the investigation proceeded based upon the cell phone that was in Olson's possession, which Pennington found out belonged to Lowe. Pennington stated that one number in the phone stood out to him because it was called several times in the matter of a one-hour block in the afternoon. Pennington explained that in his experience, the frequent contacts indicated a user who was trying to get drugs from his or her dealer.

{¶ 16} Pennington then asked Olson to contact that number and order the same product that was purchased just a few hours prior. The phone call was placed on speaker phone, and Pennington testified that the voice he heard on the other end of the line matched appellant's voice, which Pennington heard when he arrested him. Pennington testified that Olson ordered the drugs, and appellant directed them to ultimately meet him at an apartment complex. When they arrived at the apartment complex, Pennington observed a "tan, gold car" with tinted windows in the parking lot. Pennington then had Olson make another call to the number on his phone, and Pennington heard appellant say that he was at the door and Olson should just come up and meet him. When Pennington looked, he observed appellant standing at the door of an apartment building with a phone.

7.

Pennington and Olson then approached appellant, at which time Pennington identified himself as police. Pennington observed appellant toss a small bag of white substance onto the ground then turn to run up a flight of stairs. Before reaching the top, appellant complied with Pennington's orders and surrendered. Pennington then called the number that Olson identified as his drug dealer, and appellant's phone rang.

{¶ 17} Pennington testified that he asked appellant which apartment he came from, and appellant nodded to an apartment that had a door slightly ajar. Inside the apartment were drugs, and, next to appellant's identification, a wad of cash. Test results later showed that drugs found in the baggy and in the apartment totaled 1.95 grams of acrylfentanyl and 6.91 grams of cocaine. In addition to the drugs, cash, and appellant's identification, Pennington testified that officers found a set of car keys, which he took and used to unlock and start the "tan, gold vehicle" with tinted windows that was in the parking lot.

{¶ 18} Finally, Pennington testified regarding the toxicology report completed relative to Lowe. Pennington testified that Lowe tested positive for "opiates," "cocaine," and "tricyclics." Pennington explained that acrylfentanyl is an opiate, and further explained that hospital toxicology reports often are not as detailed as coroner's toxicology reports.

{¶ 19} Following Pennington's testimony and the admission of exhibits, the state rested. Appellant then moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. Appellant then rested without presenting any evidence. The trial court

8.

instructed the jury, and after deliberations, the jury returned with a verdict of not guilty as to the counts of possession and trafficking of cocaine, and guilty as to the counts of aggravated possession and aggravated trafficking of fentanyl. The jury also found appellant guilty of the count of corrupting another with drugs.

{¶ 20} At the sentencing hearing on July 31, 2018, the trial court found that the counts of aggravated possession and aggravated trafficking merged, and the state elected to proceed to sentencing on the count of aggravated trafficking. The trial court sentenced appellant to 17 months in prison on that count, and ordered the term to be served consecutive to an eight-year prison term on the count of corrupting another with drugs, for a total prison term of nine years and five months.[1]

## II. Assignments of Error

{¶ 21} Appellant has timely appealed his conviction, and now asserts six assignments of error for our review:

1. Defendant-Appellant's convictions for aggravated possession of drugs and aggravated trafficking in drugs are not supported by sufficient evidence to satisfy the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution.

---

[1] The trial court further ordered appellant to serve a 17-month prison sentence in an unrelated case, and ordered that sentence to be served consecutive to the sentence in this case.

2. Defendant-Appellant's conviction for corrupting another with drugs is not supported by sufficient evidence to satisfy the requirements of the due process clause of the Fourteenth Amendment to the United States Constitution.

3. Defective jury instructions deprived defendant-appellant of his right under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to a reliable jury determination as to every essential element of the charged offenses.

4. "Sandbagging" by the state deprived defendant-appellant of his due process right under the Fourteenth Amendment to an adjudication of the merits of his motion to suppress physical evidence on Fourth Amendment grounds.

5. Multiple instances of deficient performance deprived defendant-appellant of his right to the effective assistance of counsel guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution.

6. The trial court's refusal to merge defendant-appellant's convictions for aggravated trafficking in drugs and corrupting another with drugs violated R.C. 2941.25, the allied offenses statute, and his rights under the double jeopardy clause of the Fifth and Fourteenth Amendments to the United States Constitution.

**III. Analysis**

**{¶ 22}** In his first and second assignments of error, appellant argues that his convictions are based upon insufficient evidence. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**A. Possession and Trafficking in Drugs**

**{¶ 23}** In his first assignment of error, appellant argues that his convictions for aggravated possession of drugs and aggravated trafficking in drugs are based on insufficient evidence. Appellant was charged and convicted of aggravated possession of drugs under R.C. 2925.11(A) and (C)(1)(a), which provided at the time of the offense and trial,

(A) No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

(1) If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana, cocaine, L.S.D., heroin, hashish, and controlled substance

analogs, whoever violates division (A) of this section is guilty of aggravated possession of drugs. The penalty for the offense shall be determined as follows:

      (a) Except as otherwise provided in division (C)(1)(b), (c), (d), or (e) of this section, aggravated possession of drugs is a felony of the fifth degree.

Likewise, appellant was charged and convicted of aggravated trafficking in drugs under R.C. 2925.03(A)(2) and (C)(1)(a), which provided at the time of the offense and trial,[2]

      (A) No person shall knowingly do any of the following:

      * * *

      (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

      * * *

      (C) Whoever violates division (A) of this section is guilty of one of the following:

---

[2] Both R.C. 2925.11 and 2925.03 have been amended twice since the time of appellant's conduct and trial. For ease of discussion, any reference to those sections will be to the versions in effect through October 30, 2018.

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, with the exception of marihuana, cocaine, L.S.D., heroin, hashish, and controlled substance analogs, whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

(a) Except as otherwise provided in division (C)(1)(b), (c), (d), (e), or (f) of this section, aggravated trafficking in drugs is a felony of the fourth degree.

{¶ 24} Appellant contends that while the indictment specified that he possessed and trafficked in fentanyl, which is a Schedule II drug under R.C. 3719.41(B)(9), the state only presented evidence that he possessed and trafficked acrylfentanyl, which is not listed as a Schedule I or II drug under R.C. 3719.41. Indeed, the state's witnesses testified that acrylfentanyl is an analog of fentanyl. However, R.C. 2925.11(C)(1) and 2925.03(C)(1) expressly exclude "controlled substance analogs" from the definition of the offense. Thus, appellant concludes that the state failed to establish all of the elements of R.C. 2925.11(C)(1) and 2925.03(C)(1). We agree.

{¶ 25} In *State v. Delfino*, 22 Ohio St.3d 270, 274, 490 N.E.2d 884 (1986), the Ohio Supreme Court recognized that "[p]roof of possession of marijuana will not sustain a conviction of possession of cocaine. Likewise, proof of possession of cocaine will not sustain a conviction for possession of marijuana." Thus, the court reasoned that "[s]ince

13.

different facts are required to be proven to sustain a conviction under the different subsections [of R.C. 2925.11(C)], we can conclude * * * that the legislature intended the possession of the different drug groups to constitute different offenses." *Id.*

{¶ 26} Here, R.C. 2925.11(C)(1) and 2925.03(C)(1) require proof that appellant possessed and trafficked in a Schedule I or II drug, with the exception of controlled substance analogs. In contrast, R.C. 2925.11(C)(8) and 2925.03(C)(8) require proof that appellant possessed and trafficked in a controlled substance analog. *See* R.C. 2925.11(C)(8) ("If the drug involved is a controlled substance analog or compound, mixture, preparation, or substance that contains a controlled substance analog, whoever violates division (A) of this section is guilty of possession of a controlled substance analog."); R.C. 2925.03(C)(8) ("If the drug involved in the violation is a controlled substance analog or compound, mixture, preparation, or substance that contains a controlled substance analog, whoever violates division (A) of this section is guilty of trafficking in a controlled substance analog."). Applying the rationale in *Delfino*, proof that appellant possessed and trafficked in a controlled substance analog will not sustain a conviction for possessing and trafficking in a Schedule I or II drug. Therefore, because the state only provided evidence that the drug in question was acrylfentanyl, a controlled substance analog, and did not provide any evidence that the drug in question was fentanyl, a Schedule II drug, appellant's convictions for possession and trafficking in a Schedule II drug under R.C. 2925.11(C)(1) and 2925.03(C)(1) are based upon insufficient evidence.

14.

{¶ 27} Arguing against this result, the state contends that acrylfentanyl must be treated as a Schedule I drug pursuant to R.C. 3719.013. R.C. 3719.013 states, "Except as otherwise provided in section 2925.03 or 2925.11 of the Revised Code, a controlled substance analog, to the extent intended for human consumption, shall be treated for purposes of any provision of the Revised Code as a controlled substance in schedule I." We find the state's argument to be meritless since R.C. 3719.013 expressly recognizes that controlled substance analogs are treated differently from Schedule I drugs in the trafficking and possession statutes, R.C. 2925.03 and 2925.11, respectively.

{¶ 28} Accordingly, we hold that appellant's convictions under R.C. 2925.11(C)(1) and 2925.03(C)(1) are based upon insufficient evidence and must be reversed and vacated. Appellant's first assignment of error is well-taken.

### B. Corrupting Another with Drugs

{¶ 29} In his second assignment of error, appellant argues that his conviction for corrupting another with drugs under R.C. 2925.02(A)(3) is based upon insufficient evidence. R.C. 2925.02 provided at the time of his conduct and trial,[3]

> (A) No person shall knowingly do any of the following:
>
> * * *

---

[3] R.C. 2925.02 has been amended twice since the time of appellant's conduct and the trial. For ease of discussion, any reference to that section will be to the version in effect through October 30, 2018.

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent.

{¶ 30} Appellant argues, inter alia, that the state failed to prove that he knowingly provided the drugs to Lowe. A person acts "knowingly" when, regardless of purpose, "the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Appellant asserts that it was Olson who provided the drugs to Lowe, and thus Olson is the principal offender under R.C. 2925.02(A)(3). Appellant contends that to hold him culpable for Olson's conduct would require the state to prove that he aided or abetted Olson under the complicity statute. However, the state did not charge appellant under the complicity statute, and the issue was never submitted to the jury. Therefore, he concludes that his conviction cannot be supported by a theory of complicity, and it must be dismissed.

{¶ 31} The state, on the other hand, argues that the evidence at trial and its reasonable inferences establish that appellant sold the drugs to Lowe. In support, the state points to the fact that it was Lowe's phone that was used to contact appellant.

{¶ 32} Further, the state argues that it is not necessary to deem appellant a "principal offender" or to show that he aided or abetted Lowe's overdose. The state contends that "[a] defendant cannot be relieved of criminal liability merely because factors other than his acts contributed to the death, provided such other factors are not the

sole proximate cause of death." *State v. Emerson*, 2016-Ohio-8509, 78 N.E.3d 1199, ¶ 24 (2d Dist.), quoting *State v. Carter*, 2d Dist. Montgomery No. 21820, 2007-Ohio-5570, ¶ 27. Applied here, the state contends that serious physical harm to any drug user reasonably could be anticipated by an ordinarily prudent person, and thus appellant, as the drug dealer, is validly held responsible for that physical harm.

{¶ 33} Although not clearly stated, to the extent that the state is arguing that a drug dealer can be found guilty of corrupting another with drugs under R.C. 2925.02(A)(3) whenever the ultimate user suffers serious physical harm, we disagree. Such a broad application impermissibly rewrites the language of the statute. R.C. 2925.02(A)(3) defines the crime as knowingly furnishing drugs to another, where "the other person" suffers serious physical harm. The statute does not state "any other person," but rather explicitly limits it to the person to whom the drugs were furnished. Thus, appellant must knowingly provide the drugs to the person who ultimately suffered the serious physical harm.

{¶ 34} In this case, we hold that the evidence is insufficient to establish that appellant knowingly provided the drugs to Lowe. The only evidence establishing a link between appellant and Lowe is Pennington's testimony that the phone used to contact appellant belonged to Lowe. Curiously, no testimony or evidence was provided to demonstrate how Pennington had personal knowledge of this fact. Nonetheless, even accepting that it was Lowe's phone that was used to contact appellant, the state did not provide any evidence that appellant was aware that Lowe would receive the drugs.

17.

{¶ 35} The evidence presented consists of C.L.'s testimony that it was Olson that was on the telephone on the trip from Detroit to Toledo. There was no testimony that Lowe ever used the telephone. C.L. testified that Olson left their vehicle and approached appellant's car. There was no testimony or evidence demonstrating that appellant could see into the car that Olson came from to see who was present. In fact, C.L. was unable to see into appellant's car to identify him. Further, Bragg and Pennington both testified that Olson used his phone to contact appellant to set up another purchase of the same product that had been ordered just a few hours prior. To reach the conclusion that appellant knowingly provided the drugs to Lowe, one would have to infer that appellant knew both Lowe and Olson and knew that Lowe and Olson were together at the time, and from that infer that appellant knew that Olson intended to share the drugs with Lowe. This chain of reasoning, however, constitutes an impermissible stacking of inferences. *See Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph one of the syllabus ("An inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury."). In this case, there is simply no evidence that Lowe was involved in any of the drug transactions.

{¶ 36} In contrast, in *State v. Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423, the Eleventh District rejected the defendant's claim that he did not knowingly furnish drugs to the victim, where the defendant sold the drugs to a third party, who then gave the drugs to the victim. In that case, eyewitness testimony

18.

established that while the defendant remained at the door, the victim gave the money to the third party, who then handed it to the defendant. *Id.* at ¶ 17. In return, the defendant gave the drugs to the third party. Neither the victim nor the eyewitness spoke with the defendant. Similarly, the third party testified that he called the defendant to arrange to buy $50 worth of heroin for the victim. When the defendant went to hand him the drugs, he said "No, [the victim], she has the money. Hand it to her." The defendant then set the drugs down on a table, and the victim handed him a fifty dollar bill. *Id.* at ¶ 20. In affirming the defendant's conviction for corrupting another with drugs, the Eleventh District held that there was sufficient evidence that the defendant knew he was giving the victim access to heroin by the sale to or through the third party. *Id.* at ¶ 86.

{¶ 37} Likewise, in *State v. Price*, 2019-Ohio-1642, 135 N.E.3d 1093, ¶ 48-51 (8th Dist.), the Eighth District held that there was sufficient evidence to prove that the defendant furnished the drugs to the victim when he sold the drugs to a third party. There, text messages between the third party and the defendant showed that the third party had "people waiting" to purchase the drugs from her once she received them from the defendant. The third party even testified that she told the defendant that the drugs were for someone else. Further, she testified that the defendant and the victim were in her apartment at the same time, and even acknowledged each other when the victim purchased the drugs from her. *Id.* at ¶ 51.

{¶ 38} Here, unlike *Patterson* and *Price*, there is no evidence that appellant had knowledge that Olson was purchasing the drugs for Lowe or that he would share the

19.

drugs with Lowe. Therefore, we hold that the evidence is insufficient to establish that appellant furnished the drugs to Lowe, and therefore his conviction for corrupting another with drugs must be reversed and vacated.

{¶ 39} Accordingly, appellant's second assignment of error is well-taken.

### C. Remaining Assignments of Error

{¶ 40} As to appellant's remaining assignments of error, in light of our holding that his convictions must be reversed, we find appellant's third, fourth, fifth and sixth assignments of error not well-taken as moot.

### IV. Conclusion

{¶ 41} For the foregoing reasons, we find that substantial justice has not been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is reversed. Specifically, appellant's convictions for aggravated possession of drugs under R.C. 2925.11(A) and (C)(1)(a), aggravated trafficking in drugs under R.C. 2925.03(A)(2) and (C)(1)(a), and corrupting another with drugs under R.C. 2925.02(A)(3) are reversed and vacated, and the charges against him dismissed. The state is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed
and vacated.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                                    _____
                                                                                    JUDGE

Thomas J. Osowik, J.
CONCUR.                                                         _____
                                                                                    JUDGE


Christine E. Mayle, J.                                      _____
CONCURS AND WRITES                                              JUDGE
SEPARATELY.


**MAYLE J.**

{¶ 42} I concur in the judgment of the majority. I write separately, however, because with respect to Ridley's second assignment of error, I would find that his conviction of corrupting another with drugs must be reversed because the state failed to prove that the drug identified at trial—acrylfentanyl—is a controlled substance analog.

{¶ 43} Ridley was convicted under R.C. 2925.02(A)(3), which prohibits a person from knowingly "furnish[ing] to another * * * a controlled substance, and thereby

caus[ing] serious physical harm to the other person." A "controlled substance" is defined by R.C. 3719.01(C) as "a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V." The controlled substance schedules are set forth in R.C. 3719.41.

{¶ 44} Acrylfentanyl is not identified in any of the schedules, however, the state maintains that it is a "controlled substance analog" of fentanyl. Under R.C. 3719.013, "[e]xcept as otherwise provided in section 2925.03 or 2925.11 of the Revised Code, a controlled substance analog * * * shall be treated for purposes of any provision of the Revised Code as a controlled substance in schedule I." In other words, a person may be convicted under R.C. 2925.02(A)(3) for furnishing a drug not identified in the schedules if that drug is a "controlled substance analog."

{¶ 45} A "controlled substance analog" is defined by R.C. 3719.01(HH)(1) as:

[A] substance to which both of the following apply:

(a) The chemical structure of the substance is substantially similar to the structure of a controlled substance in schedule I or II.

(b) One of the following applies regarding the substance:

(i) The substance has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

22.

(ii) With respect to a particular person, that person represents or intends the substance to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

{¶ 46} "The Government has the burden of proving beyond a reasonable doubt that [the substance at issue] meet[s] the statutory definition of a controlled substance analogue." *United States v. Klecker*, 228 F.Supp.2d 720, 727 (E.D.Va.2002), *aff'd*, 348 F.3d 69 (4th Cir.2003) (construing analogous federal statutes[4]). In this case, to prove that acrylfentanyl is a controlled substance analog, the state was required to produce competent, probative evidence that the chemical structure of acrylfentanyl is "substantially similar" to a schedule I or II controlled substance—in this case, fentanyl— and either (1) that acrylfentanyl has an "effect on the central nervous system" that is "substantially similar" to or greater than fentanyl, or (2) that Ridley represented or intended it to have such an effect. *See State v. Wade*, 7th Dist. Jefferson No. 14 JE 0036, 2016-Ohio-8546, 71 N.E.3d 311, ¶ 31, quoting *State v. Petefish*, 7th Dist. Mahoning No. 10 MA 78, 2011-Ohio-6367, 2011 WL 6163971, ¶ 16 ("A challenge to the sufficiency of

---

[4] "Ohio's statutory scheme with regard to controlled substance analogs is virtually identical to the Controlled Substance Analogue Enforcement Act of 1986 ('the Federal Act')." *State v. Jackson*, 9th Dist. Summit No. 27132, 2015-Ohio-5246, ¶ 23, *aff'd*, 150 Ohio St.3d 27, 2016-Ohio-8363, 78 N.E.3d 832, ¶ 13-20. "[T]he federal case law interpreting the Federal Act is instructive and constitutes persuasive authority in this matter." *Id.* at ¶ 31.

23.

the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged.").

{¶ 47} The state insists that "[a]t trial, Acrylfentanyl was shown to be an analog of Fentanyl." It contends that (1) "[t]he fact that Acrylfentanyl contains 'Fentanyl' in its name, by itself, indicates that Acrylfentanyl is a derivative form of Fentanyl"; and (2) Sergeant Bragg and Detective Pennington provided the testimony necessary to show that acrylfentanyl is a controlled substance analog.

{¶ 48} Clearly, R.C. 3719.01(HH)(1) does not provide that a drug's status as a controlled substance analog may be established merely by virtue of its name. *See, e.g., People v. Davis*, 303 P.3d 1179 (Cal.2013) (construing similar California statutes and concluding that "chemical name, standing alone, is insufficient to prove that it contains a controlled substance or meets the definition of an analog"). Accordingly, we must examine the evidence presented by the state to determine whether any rational trier of fact could have found that it proved beyond a reasonable doubt that acrylfentanyl is a controlled substance analog.

{¶ 49} The state relies on Sergeant Bragg and Detective Pennington's testimony as establishing that acrylfentanyl is a controlled substance analog. Sergeant Bragg testified:

> [T]here are so many types of fentanyl out there, and it is all analogue-type substances. And what they are doing in these labs, they are basically taking one little chromosome or whatever and moving it just one

angle, but moving it, and it totally changes the whole structure of the drug that kind of does similar things, but it's still the same type of drug.

\* \* \*

It's, in the beginning, it kind of started, it was kind of just heroin and heroin mixed with cocaine, and then it eventually evolved and you are seeing heroin with fentanyl, then it was just straight fentanyl, and then these analogue substances started changing and we started to see carfentanyl, acrylfentanyl, all of these different types of fentanyls.

\* \* \*

[T]hey are just taking these certain molecular structure of this fentanyl and making it different and just calling it a different name. Detective Pennington testified:

Q: Detective, since you've been part of the Heroin Task Force, have you become familiar with opiate drugs?

A: Yes, I have.

Q: Could you just list some opiate drugs for the jury?

A: Opiate drugs consist of heroin, morphine, fentanyl, analogues of fentanyl such as acrylfentanyl, carfentanyl, norfentanyl, et cetera.

{¶ 50} The typical method of proving a drug's status as a controlled substance analog is to present the testimony of witnesses who are experts in the field of chemistry, pharmacology, or toxicology. *See, e.g., Jackson*, 9th Dist. Summit No. 27132,

2015-Ohio-5246, at ¶ 13-20 (forensic chemists, pharmaceutical chemist, and toxicologist testified concerning substantial similarity of chemical structures of Pentedrone and Methcathinone and effects on central nervous system); *State v. Shalash*, 2015-Ohio-3836, 41 N.E.3d 1263, ¶ 48-56 (12th Dist.), *aff'd*, 148 Ohio St.3d 611, 2016-Ohio-8358, 71 N.E.3d 1089, (2016) (forensic chemist and pharmacologist/toxicologist testified concerning substantial similarity of chemical structures of substances in bath salts and their effects on central nervous system).  No evidence was presented here that would suggest that Sergeant Bragg or Detective Pennington have expertise in any of these fields, and, in fact, the state conceded while discussing jury instructions that "nobody's been qualified as an expert."

{¶ 51} However, the Supreme Court of Ohio has held that lay witness testimony may be admitted for drug identification purposes.  *State v. Gonzales*, 6th Dist. Wood No. WD-13-086, 2015-Ohio-461, ¶ 21, *rev'd on other grounds*, 150 Ohio St.3d 276, 2017-Ohio-777, 81 N.E.3d 419, ¶ 23-24, citing *State v. McKee*, 91 Ohio St.3d 292, 295-298, 744 N.E.2d 737 (2001).  "For drug identification testimony to be admissible under *McKee*, the state need only establish the competence of the proposed lay witness."  *Id.* at ¶ 23.  Competence is established by providing a foundation demonstrating that "the lay witness has a sufficient amount of experience and knowledge either from having dealt with or having used the same type of controlled substance in the past that he or she is now being asked to identify."  (Internal quotations and citations omitted.)  *Id.*

26.

{¶ 52} But this is not a simple drug identification issue. Federal courts applying similar federal controlled-substance analog statutes have observed that "[a]nalogue drug cases have an added layer of complexity that does not exist in controlled substance cases." *United States v. Reulet*, D.Kan. No. 14-40005-DDC, 2016 WL 191883, *4 (Jan. 14, 2016). Whereas a controlled substance, explicitly listed on a schedule, "has a specific, scientifically determined meaning," that can be tested and identified, "no scientific test exists to reach a universally accepted conclusion that a substance is or is not a controlled substance analogue." *Id.* Rather, whether a substance is a controlled substance analogue "requires evidence of the chemical makeup of the alleged analogue, which will generally be produced in the form of expert testimony at trial." *United States v. Waddell*, W.D. Mo. No. 14-03012-CR-S-BP-01, 2015 WL 997713, *2 (Mar. 6, 2015). It is then for the jury to determine whether the "facts establish that a substance has a substantially similar chemical structure to a controlled substance and has, or was represented to have, a substantially similar pharmacological effect to a controlled substance." *Reulet* at *4. *See also United States v. Way*, E.D.Cal. No. 1:14-cr-00101-DAD-BAM-1. 2018 WL 5310773, *6 (Oct. 25, 2018) (observing that this procedure renders analogue drug prosecutions "quite unlike other drug prosecutions under the Controlled Substances Act * * *").

{¶ 53} Given the complexity of establishing that a drug is a controlled substance analog—a fairly technical determination—I do not believe that lay witness testimony could ever suffice in such a situation. But even if it could, I would find that Sergeant

27.

Bragg and Detective Pennington's opinions were not properly admitted because their competence was not established by way of providing a proper foundation. *See McKee* at 297 (finding that lay witnesses' drug identification testimony should have been excluded because it was "sketchy and conclusory," lacking foundation).

{¶ 54} Detective Pennington made only a conclusory statement that acrylfentanyl is an analog of fentanyl. And while Sergeant Bragg attempted to explain the concept of analog drugs—describing that "they are basically taking one little chromosome or whatever and moving it just one angle" and the analog "kind of does similar things"—I would find that (1) his testimony falls far short of showing the substantial similarity in the chemical structure of acrylfentanyl and fentanyl and their effects on the central nervous system, and (2) at no time did he describe any experience or knowledge that would qualify him to render opinions about its chemical structure and the effects on the central nervous system. Like the Ohio Supreme Court in *McKee,* I would find the witnesses' testimony "sketchy and conclusory."[5]

{¶ 55} Finally, the state points out—and it is correct—that Ridley did not object at trial to Sergeant Bragg and Detective Ridley's qualifications or to their testimony. As

---

[5] I would also note that federal courts hold that in cases involving controlled substance analogs, "[a] qualified expert may opine about the factual criteria" adopted by the statute for determining whether a substance is "a controlled substance analogue," but he or she may not testify on the ultimate issue "that a drug is or is not a controlled substance analogue." *Reulet*, D.Kan. No. 14-40005-DDC, 2016 WL 191883, at *3. Rather, based on the expert's testimony, the *jury* must "apply the law's definition of controlled substance analogue to the facts" and determine whether the government has met its burden of establishing the substance's legal status as a controlled substance analog. *Id.*

28.

such, it argues, Ridley has waived this issue on appeal. We have recognized, however, that "a conviction based on legally insufficient evidence amounts to a denial of due process and is plain error requiring reversal." *State v. Messer*, 6th Dist. Lucas No. L-16-1109, 2017-Ohio-1223, ¶ 18. And the failure to object at trial to the insufficiency of the evidence does not waive a defendant's right to raise the challenge on appeal. *Id.* at ¶ 16, citing *State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163 (2001); *State v. Carter*, 64 Ohio St.3d 218, 223, 594 N.E.2d 595 (1992).

{¶ 56} In fact, *McKee*, 91 Ohio St.3d 292, 744 N.E.2d 737, involved similar circumstances. In *McKee*, the defendant was charged with furnishing a controlled substance to a juvenile, a violation of R.C. 2925.02(A)(4)(a). The only element of the crime that was in dispute was the identity of the substance as marijuana, and the only testimony with respect to this issue was the juveniles' testimony identifying the substance as such. The state argued that the issue was not preserved for appeal because the defense failed to object to the girls' testimony, either at trial or in the court of appeals. The Ohio Supreme Court acknowledged that "[e]rrors that arise during a trial that are not brought to the attention of the court are ordinarily waived and may not be raised on appeal unless there is plain error, *i.e.,* but for the error, the outcome of the trial clearly would have been otherwise." *Id.* at 294, citing Crim.R. 52(B); *State v. Johnson*, 88 Ohio St.3d 95, 111, 723 N.E.2d 1054 (2000). It determined that the case was appropriate for a plain-error review, and it concluded that "[b]ecause there was no additional evidence concerning the

29.

identification of the substance, the result of the trial would have been different if the girls' testimony had been excluded." *Id.*

{¶ 57} Here, too, the only evidence that acrylfentanyl is a controlled substance analog was the testimony of Sergeant Bragg and Detective Pennington. Without their testimony, there was no remaining evidence of an essential element of the offense. "When evidence of an element of the crime is deemed insufficient on appeal, the conviction must be reversed." *McKee* at 298. In this case, I agree with the majority decision to reverse, but I would do so because the state failed to prove that acrylfentanyl is a controlled substance analog.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.